942 So.2d 1279 (2006)
DOUBLE-EIGHT OIL AND GAS L.L.C. and Oak Hill Management L.L.C., Plaintiffs-Appellants,
v.
CARUTHURS PRODUCING CO., INC., Defendant-Appellee.
No. 41,451-CA.
Court of Appeal of Louisiana, Second Circuit.
November 20, 2006.
*1280 Seabaugh, Benson, Keene & Denny by J. Ransdell Keene, J. Todd Benson, Shreveport, Jones, Odom, Davis & Politz, L.L.P. by J. Marshall Jones, Jr., Shreveport, for Appellants, Oak Hill Management, L.L.C. and Double-Eight Oil and Gas, L.L.C.
Downer, Hammond & Wilhite, L.L.C. by Philip E. Downer, III, William R. Huguet, Shreveport, for Appellees Caruthers Producing Co., Inc. and C. Dewitt Caruthers.
Before WILLIAMS, GASKINS and MOORE, JJ.
GASKINS, J.
This case, involving expenses for operating gas wells, arises from what the trial *1281 court characterized as a "brother-in-law deal." The plaintiffs appeal from an adverse trial court judgment denying their claims against the defendants and awarding damages in favor of one of the defendants, Caruthers Producing Co., Inc. ("CPC"). The defendants answered the appeal, seeking attorney fees. We affirm the trial court judgment.

FACTS
On February 15, 2002, Double-Eight Oil and Gas, L.L.C., and Oak Hill Management, L.L.C., filed suit against CPC. The plaintiffs stated that they were the owners of 70 percent of the working interest of two gas wells in Bossier Parish ("Flat River Farms No. 1" and "Mendenhall No. 1"). According to the petition, the defendant took over as operator of the wells in September 2001 without benefit of an executed operating agreement; thereafter, the defendant allegedly took action which caused these two producing wells to become nonproducing. The plaintiffs sought damages for this conduct, as well as a declaratory judgment that they did not owe the defendant for invoices submitted by the defendant on the two wells.
In March 2002, CPC filed an answer and a reconventional demand in which it asserted that the plaintiffs owed it for services and materials on the wells mentioned in the petition and they had refused to pay after demand was made. Specifically, it contended that Oak Hill currently owed $22,478 and Double-Eight owed $134,867.89, and that additional amounts would be incurred over time. CPC also alleged that Double-Eight owed $6,753.99 for services and materials on another well ("Antrim Well") and refused to pay the defendant; additional expenses would also increase over time for this well. CPC requested attorney fees.
In May 2002, the plaintiffs filed a supplemental and amending petition that added C. Dewitt ("Witt") Caruthers as a defendant. They also complained that when CPC named itself as "operator of record," it did not request that the owners of the wells execute a "Model Form Operating Agreement" designating CPC as the operator. Furthermore, the plaintiffs claimed that the defendants spent significant sums of money unnecessarily in testing and reworking the wells to obtain data that would benefit the defendants in drilling wells in another area. These actions supposedly resulted in the destruction of the wells at issue here. The plaintiffs requested damages under theories of negligence, conversion, quantum meruit and/or unjust enrichment. They also asserted entitlement to damages and attorney fees under the Louisiana Unfair Trade Practices Act, and requested an accounting of equipment and production proceeds.
A bench trial was held over 17 days in August 2004, January 2005, March 2005, and May 2005. On November 14, 2005, the trial court issued a written opinion in which it dismissed the plaintiffs' claims against the defendants. It noted at the outset that the catalyst giving rise to the lawsuit was literally a "brother-in-law deal" between Scott Pernici, one of the owners of Double-Eight, and Witt Caruthers, one of the defendants, Pernici being married to Caruthers' sister. The initial contract between the parties involved a section referred to as the McDade Prospect, which is located in south Bossier Parish. The agreement did not require the well operator to use AFE's, which are written authorizations for expenditures whereby the participants agree in advance as to the work to be performed. The participants with a before payout interest were required to bear their ratable share *1282 of costs incurred. Since the participants all readily agreed and participated at the outset, the trial court found that they were all bound by the original agreement which did not require an operating agreement or the use of AFE's. Originally there were seven participants; the well operator was Summit Oil and Gas, a company owned by two of the participants, Vernon Monk and Larry Conly. Monk's and Conly's interests were later acquired by CPC. The trial court found that the plaintiffs, more probably than not, knew or should have known of this acquisition and CPC's assumption of the role of operator. The court also held that it was more probable than not that the plaintiffs knew or should have known, as "hands-on investors," of the squeeze operations[1] and their extent. Furthermore, the court ruled that CPC acted properly with regard to its fiduciary duty to the plaintiffs.
The trial court found that none of the information obtained by the Bossier Parish squeeze operations could have benefitted the well operations in south Caddo Parish. At any rate, despite the plaintiffs' complaints that they were to be included in the drilling in south Caddo Parish performed by CPC and other investors, the court held that there was no contractual evidence that they were ever included in that deal.
As to the allegations of violations of Louisiana's Unfair Trade Practices Act, the court found no violations because the parties were not competitors, as well as no deceptive acts by the defendants damaging the plaintiffs. However, finding no bad faith by the plaintiffs, the court denied the defendants' request for attorney fees under La. R.S. 51:1409.
On the defendants' reconventional demand, the trial court awarded damages in the following amounts: from the McDade Prospect, Double-Eight owed $134,260.08 and Oak Hill owed $21,898.53; from Antrim Trust # 1, Double-Eight owed $4,965.41. Interest from the date of judicial demand was decreed. The court denied CPC's request for attorney fees under La. R.S. 9:2781.
Judgment was signed January 30, 2006. Costs were assessed against the plaintiffs.

BREACH OF FIDUCIARY DUTY
The plaintiffs contend that the trial court erred in finding that the defendants did not fail in their fiduciary obligations to them.

Law
An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State through Department of Transportation and Development, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). In fact, "where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart, supra. The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one in light of the evidence in the record. Stobart, supra.
A fiduciary relationship is defined in terms of a trust, a confidence and the advantage that one party may have over another. The duty imposed on a fiduciary *1283 embraces the obligation to render a full and fair disclosure to the beneficiary of all facts which materially affect his rights and interests. This definition is made in the context of a business or financial relationship. Riddle v. Simmons, 40,000 (La. App.2d Cir.2/16/06), 922 So.2d 1267, writ denied, XXXX-XXXX (La.6/2/06), 929 So.2d 1259.

Background
In the summer of 2000, Witt Caruthers and Jeff Thompson, a geologist, presented information to Scott Pernici about a deal to drill gas wells in an area of south Bossier Parish referred to as the McDade Prospect. Believing that the project looked profitable, Scott Pernici put together a group of participants which originally included Double-Eight (owned equally by Scott and his father, Frank Pernici); Richard Pernici, Scott's brother; Mark Roberts; and Larry Conly and Vernon Monk, the owners of Summit Oil and Gas. Richard Pernici's interest was eventually acquired by Oak Hill, a company owned by Frank Pernici and his wife. Both Thompson and Witt Caruthers, through their respective companies,[2] received APO rights, or rights to a percentage of revenues after payment of all drilling costs of the wells. Since Double-Eight was the majority owner in the project, Scott Pernici chose Summit as operator of the well. The parties did not enter into an operating agreement; however, they did enter into a participation agreement in October 2000 which outlined ownership percentages and cost obligations.[3] Also, Summit did not utilize authorization for expenditure (AFE's) forms; an AFE is a document used in the oil and gas business to get written approval from the working interest owners before work is performed. Instead the parties informally discussed matters and obtained verbal permission. Between February and June of 2001, Summit drilled four wells in the McDade Prospect, only two of which were productive, Flat River Farms No. 1 and Mendenhall No. 1.
In July 2001, Witt Caruthers and Art Walker became owners of CPC by buying out the interest of other members of the Caruthers family, including that of Scott Pernici's wife, Sheila. In September 2001, CPC bought the interest of Monk and Conly in the McDade Prospect. It became the operator of record of the McDade wells, a position formerly held by Summit, Monk and Conly's company. (Later, CPC acquired Roberts' interest in the project.)
In October 2001, squeezes were performed on the two productive McDade wells, Flat River Farms No. 1 and Mendenhall No. 1, because of problems with the wells producing salt water and/or not being able to maintain production. Expert testimony produced at trial established that the wells had no commercially productive reserves. The Mendenhall well was pressure depleted while the Flat River Farms well apparently did not make enough gas to pressure deplete. The squeezes were intended to use cement to seal off the flow from the saltwater sand. *1284 However, the squeezes were unsuccessful, and it was not possible to rectify the problems with the wells. Ultimately both wells were plugged and abandoned.
In the meantime, CPC had undertaken the drilling of some wells in Caddo Parish which were three to five miles from the McDade Prospect wells and from a different producing reservoir. The plaintiffs complained of their exclusion from this deal and asserted that the squeezes on the McDade wells constituted some sort of experimentation that was designed to somehow benefit the Caddo wells. However, Witt Caruthers testified that Scott Pernici declined participation in the Caddo wells when the opportunity was offered to him; as a result, Witt Caruthers looked elsewhere for investors. The plaintiffs criticized Witt Caruthers for using information from the McDade wells to encourage interest in the Caddo project. The defendants responded that this was the type of information generally known and shared in the oil and gas industry.
The defendants presented expert testimony that the squeezes performed on the two McDade wells were reasonable, necessary and prudent. Furthermore, the experts testified that they were performed in conformity with industry standards. The plaintiffs presented no expert testimony to refute this evidence. Additionally, all of the expert testimony presented at trial established that the squeezes on the McDade wells could not have produced any information that would have been relevant or useful to the Caddo wells.
Based upon the evidence in this record, we find no manifest error by the trial court. To the contrary, the trial court did an excellent job of defining the issues and resolving them. The evidence demonstrated that the defendants acted reasonably and prudently.

Unfair Trade Practices
The plaintiffs also asserted an action under the Louisiana Unfair Trade Practices and Consumer Protection Act. La. R.S. 51:1405(A) declares "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . unlawful." To be unfair, the conduct must offend established public policy. Fraud, deceit and misrepresentation constitute deceptive practices. United Group of National Paper Distributors, Inc. v. Vinson, 27,739 (La.App.2d Cir.1/25/96), 666 So.2d 1338, writ denied, 96-0714 (La.9/27/96), 679 So.2d 1358. La. R.S. 51:1409 confers a right of private action on "[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal" from unlawful trade practices. This language has been held to confer the private right of action on both consumers and business competitors. Monroe Medical Clinic, Inc. v. Hospital Corporation of America, 522 So.2d 1362 (La.App. 2d Cir. 1988). Like the trial court, we find that the plaintiffs were not business competitors of the defendants within the meaning of the Unfair Trade Practices Act during the relevant time period. See Davis v. Manpower International, Inc., 623 So.2d 946 (La.App. 4th Cir.1993), writ denied, 629 So.2d 1173 (La.1993); W.A. Offshore Equipment Co., Inc. v. Parmatic Filter Corporation, 767 F.Supp. 125 (E.D.La. 1991). Furthermore, we agree with the trial court's conclusion that there were no unfair or deceptive acts by the defendants causing damage to the plaintiffs.
We affirm the trial court's ruling that the plaintiffs failed to prove that they were entitled to damages from the defendants.

REIMBURSEMENT
The plaintiffs also argue that the trial court erred in finding that they were *1285 liable to CPC for expenses arising from the squeezes and related operations which were incurred while CPC was the operator of the wells.
La. R.S. 31:177 states:
A co-owner of the lessee's interest in a mineral lease may not independently conduct operations or, except as provided in this article and Article 171, deal with the interest without the consent of his co-owner. He may act to prevent waste, destruction, or termination of the lease and to protect the interest of all, but cannot impose upon his co-owner liability for any costs or expenses except out of production. In so acting he must act in good faith and must deal with the interest of the remaining owner or owners in the manner of a reasonably prudent lessee whose interest is not subject to co-ownership.
Under the Louisiana Mineral Code and the Louisiana Civil Code, there is no requirement that co-owners of a mineral lease have a written operating agreement. The written agreement that was entered into by the McDade participants required those with a BPO interest to pay their "ratable share of actual costs incurred." The agreement did not require written consent prior to the incurrence of costs for decisions made by the chosen operator. Nor did the parties utilize AFE's when Summit was the well operator. Instead they conducted business verbally. These practices continued after CPC became the operator.
In order to impose preproduction liability on a co-owner, the operator must have the consent of the lease co-owners to the operations. There was evidence, deemed credible by the trier of fact, that the plaintiffs were aware of and consented to CPC's activities. Scott and Frank Pernici admitted knowing and agreeing to certain actions, such as hiring a pumper, trying to drill out a bridge plug, and placing one of the wells on a pump jack. Art Walker, a co-owner of CPC, testified unequivocally that he obtained the Pernicis' approval for all actions and discussed the costs when asked. According to Walker, when Scott recommended an operation which Walker felt was a long shot, like putting a well on a pump, they complied with Scott's wishes. Witt Caruthers also confirmed that CPC's actions were approved by the Pernicis. The telephone records and e-mails admitted into evidence demonstrate that Scott Pernici had substantial communication with Witt Caruthers and Walker at all of the relevant times. Historically, Scott was deeply involved on this lease, and the evidence shows that this participation continued even after CPC undertook the disputed operations. It also indicated that Scott spoke for his father.
La. R.S. 31:177 also mandates that the mineral lease co-owner must act in good faith and in a reasonably prudent manner. The experts in oilfield practices presented by the defendants supported the actions taken by the defendants to try to salvage well production. They concluded that the defendants acted reasonably and prudently, and that their actions conformed to accepted industry standards. No experts in oilfield practices testified on behalf of the plaintiffs.
The trial judge is charged with making credibility calls. Here, two permissible views of the evidence existed, and the trial judge's choice between them cannot be found to be manifestly erroneous or clearly wrong on appeal. The trial court did not err in granting judgment in favor of the defendants, ordering the plaintiffs to pay *1286 their ratable share of the costs incurred for the operation of the McDade wells. Nor did it err in awarding payment for the Antrim well expenses which were owed by Double-Eight to CPC and were proven at trial.

ATTORNEY FEES
The defendants answered the appeal, asserting that the trial court erred in not awarding them attorney fees under either the Louisiana Open Account Statute, La. R.S. 9:2781, or the Louisiana Unfair Trade Practices and Consumer Protection Act, La. R.S. 51:1401, et seq.

Unfair Trade Practices
Under La. R.S. 51:1409, the court may award reasonable attorney fees and costs to the defendant in a case brought under the Louisiana Unfair Trade Practices and Consumer Protection Act "[u]pon a finding by the court that an action under this section was groundless and brought in bad faith or for purposes of harassment." This provision is penal in nature and is subject to reasonably strict construction. The court has discretion in determining whether to award attorney fees under the statute. Bobby and Ray Williams Partnership, L.L.P. v. The Shreveport Louisiana Hayride Co., L.L.C., 38,224 (La.App.2d Cir.4/21/04), 873 So.2d 739, writ denied, XXXX-XXXX (La.10/8/04), 883 So.2d 1022.
The trial court denied the defendants' request for attorney fees under La. R.S. 51:1409, finding that the plaintiffs did not act in bad faith. Based upon the record before us, we find no abuse of the trial court's discretion.

Open Account
As set forth above, CPC paid for services provided to the wells at issue and the Antrim well. In billing the plaintiffs for their ratable share of these costs, CPC allege that they made a request for payment under the Louisiana Open Account Statute. While CPC was entitled to reimbursement for the plaintiffs' share of the costs, this reimbursement does not fall under that statute.
La. R.S. 9:2781(D) provides that an "`open account' includes any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions. `Open account' shall include debts incurred for professional services, including but not limited to legal and medical services. . . ."
The mere creation of a debt owed to a party does not give him an action on an open account. Inherent in the concept of an open account is that the account is for services or goods rendered. House of Raeford Farms of Louisiana, L.L.C. v. Osei-Tutu, 41,586 (La.App.2d Cir.11/1/06), 2006 WL 3079040. As between these parties, the claim for payment by the defendants is not for purchases or services rendered by the defendants to the plaintiffs, as the open account statute contemplates. The trial court properly denied the defendants' request for attorney fees under La. R.S. 9:2781.

CONCLUSION
The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellants, Double-Eight Oil and Gas, L.L.C., and Oak Hill Management, L.L.C.
AFFIRMED.
NOTES
[1] A squeeze operation is a procedure by which one tries to prevent salt water from invading a producing well by injecting cement into the well and the well is then perforated again in the hope of producing without salt water.
[2] Witt Caruthers and his wife owned Black Creek Ventures, LLC, while Thompson and his wife owned Riverside Exploration Company.
[3] Double Eight had a 60% before payout (BPO) interest and a 42% after payout (APO) interest; Roberts, 10% BPO and 7% APO; Summit, 20% BPO and 14% APO; Richard Pernici, 10% BPO and 7% APO; Riverside Exploration, 0% BPO and 15% APO; and Black Creek, 0% BPO and 15% APO.