GARRETT, J.
The defendants, KT Farms Partnership ("KT Farms"), Kyle Aymond, Thad *193 Herron, KT-One Farms, LLC ("KT-One") & Thad Kyle Investments, LLC ("TKI"), appeal from a trial court judgment finding them all liable in solido to the plaintiff, Monsanto Company ("Monsanto"), in the amount of $671,041.60 for seed and products, plus interest and court costs, as well as attorney fees of $50,000. For the following reasons, we amend in part, and as amended, affirm the trial court judgment.
FACTS
Aymond and Herron were farmers in Tensas and Franklin Parishes, and they, along with KT-One, were partners in KT Farms. Aymond and Herron formed KT-One and TKI. In February 2011, KT Farms submitted an interest-free seed financing application to Monsanto, requesting a credit limit of $245,000. This document was signed by Aymond. In addition, he signed an "Interest Free Seed Financing" agreement with Monsanto that is the subject of this case. The dealer who was to supply the Monsanto products under this agreement was Tensas Farm Service ("Tensas").
Also in 2011, TKI executed a guaranty agreement to cover the obligations of KT Farms to Monsanto. Aymond signed the guaranty on behalf of TKI. All purchases made by KT Farms from Monsanto in 2011 were paid for.
In 2013, Aymond and Herron, on behalf of KT Farms, signed one page of an incomplete document reflecting that the local dealer had been changed to Helena Chemical Company ("Helena"). According to Monsanto, in 2013, KT Farms purchased a total of $671,041.60 in seed and other products and did not pay for the goods. Demand for payment was made by certified letters mailed in February 2014 to Aymond and Herron as partners of KT Farms.[1] The letters were unclaimed and were marked "return to sender."
In July 2014, Monsanto filed a petition to collect under the 2011 financing agreement, naming as defendants KT Farms, through its partners, Aymond, Herron, and KT-One, and TKI as guarantor of KT Farms. Attached to the petition was a blurred and partially illegible copy of the financing agreement signed by Aymond in 2011; a copy of a page from an unidentified document changing the dealer to Helena, which was signed in 2013 by Aymond and Herron on behalf of KT Farms as customer; a copy of the guaranty signed by Aymond on behalf of TKI in 2011; and copies of the demand letters to KT Farms through Aymond and Herron. Monsanto alleged that, under the terms of the agreement, the defendants were liable for the debt, as well as 18% interest per year on the debt from December 31, 2013, until paid, plus 25% attorney fees.
The defendants filed an answer alleging that the copy of the 2011 agreement attached to the petition was not legible, making it impossible to determine the terms and conditions of the alleged agreement. The defendants urged that there was no information to support the claims of purchase of product, and that 25% attorney fees were excessive. They also disputed the balance owed. A pleading in the record indicates that in October 2015, KT Farms filed for bankruptcy, which was dismissed in April 2016, and the bankruptcy stay was lifted.
The matter was tried on November 30, 2016. Sharon Hernandez, the collection manager for Monsanto from Missouri, testified that KT Farms applied to Monsanto for credit through an interest-free credit financing agreement in February 2011. The agreement was to cover any purchases *194 made from Monsanto until cancelled. Aymond, on behalf of TKI, signed a guaranty agreement to cover the debt of KT Farms to Monsanto. Copies of the credit application, the 2011 agreement, and the guaranty agreement were filed into evidence. However, the copy of the 2011 agreement filed into evidence was not entirely legible and was introduced over an objection by the defendants. As explained in one of the briefs on appeal, the original document was electronically stored. The resulting copy was only partially legible. Monsanto produced neither the original agreement signed by Aymond nor a legible copy.
Hernandez identified a blank agreement submitted by Monsanto that purported to supply the missing language in the original agreement. It also provided a copy of a document signed by Aymond and Herron on behalf of KT Farms in 2013, when the Monsanto dealer was changed to Helena. Monsanto did not argue that KT Farms executed a new financing agreement in 2013. Hernandez stated that the only change to the 2011 agreement was that Helena became the dealer instead of Tensas. These documents were admitted into evidence, subject to the defendants' objection that they were not complete.
Credit memos and delivery tickets were admitted into evidence to prove that KT Farms made the alleged purchases from Monsanto. Hernandez testified that these documents corroborated the Monsanto statement of account, dated February 18, 2014, which was also admitted into evidence. She stated that Monsanto had not received payment for any of the charges, even though formal demand for payment had been made on the defendants. According to Hernandez, the goods were supplied by Helena, but the debt was owed to Monsanto.
On cross-examination, Hernandez acknowledged that the 2011 agreement had a credit limit of $245,000; she opined that KT Farms asked for and received a higher credit limit. She stated she did not know if any purchases were made in 2012, or what the credit limit was in 2013.
Mike Willis, a credit manager for Helena from Tennessee, identified documents connected with the sale of the Monsanto goods to KT Farms in 2013. He said that, once executed, a financing agreement remained in effect and the only paperwork that would have to be resubmitted to Monsanto would be acknowledgement of a change of dealer. This would allow the new dealer to receive payments from Monsanto. Willis identified the invoices and delivery tickets sent from Helena to Monsanto for payment. When Monsanto paid Helena, Helena assigned all rights for payment on the invoices to Monsanto. Willis identified credit memos from Monsanto to Helena for the invoices submitted for payment.
Willis said that customers often called in orders which Helena delivered to the farms after purchase. Sometimes they were signed for and sometimes they were not. He was asked how Helena verified that the person placing the order was the person who received the delivery. He stated that their locations were very familiar with their customers and recognized their voices on the telephone. They also knew the locations where the products were to be delivered. He said sometimes a customer will pick up an order. Willis testified that he did not know of any complaints that orders placed for KT Farms were not legitimate or were not delivered.[2]
*195 Aymond testified that he and Herron handled all orders placed with Helena. Sometimes they would call the store and sometimes they went to the store to place orders. Products were then delivered to them. Aymond examined the delivery tickets and invoices and observed that some of them were difficult to read. He claimed the tickets were not signed by people connected with KT Farms and said he had no way to know if he received the seed and supplies represented by the tickets.
On cross-examination, Aymond acknowledged signing the financing agreement with Monsanto in 2011, with a $245,000 credit limit, but said the signature on the document supplied by Monsanto did not look like his. He also denied ever signing a personal guaranty agreement or entering into a financing agreement with Helena as the supplier in 2013.
Herron was called by Monsanto on cross-examination. He acknowledged that, in 2011, KT Farms applied to Monsanto for interest-free financing. He examined the 2011 financing agreement and said the signature on the document looked like Aymond's. Herron acknowledged that KT Farms made purchases from Helena in 2013. He said he was a partner in TKI, but did not remember the company signing a guaranty agreement with Monsanto in 2011. Herron first testified that KT Farms did not file for bankruptcy in 2015. He later said that Aymond filed the paperwork, but KT Farms did not go through with the bankruptcy. He did not know if the $671,041.60 debt at issue in this case was listed as a debt in the bankruptcy filings or if he signed the bankruptcy papers.
The trial court took the matter under advisement and issued written reasons and a judgment in favor of Monsanto. In the reasons for judgment, the trial court found that, in 2011, KT Farms entered into the "Interest Free Seed Financing Agreement" with Monsanto. The court found that TKI, "Kyle Aymond and Thad Herron guaranteed the obligations of KT Farms." In 2013, the dealer was changed from Tensas to Helena. The court stated that, from April to June 2013, KT Farms used the credit extended in the financing agreement to obtain products totaling $671,041.60. No payments were made and no response was made to Monsanto's demand for payment. The court noted that, at trial, Aymond and Herron claimed that the goods were not delivered to KT Farms.
The court found that Monsanto carried its burden of proof on the amount owed and noted that the agreement called for 18% interest per year, from December 31, 2013, until paid, along with reasonable attorney fees. According to the court, Monsanto sought 26% attorney fees, which would amount to $175,000, but the trial court found this was unconscionably excessive.[3] The trial court considered the hours worked, the expertise of the attorney, and the fact that the attorney took the case on a 15% contingency fee agreement. The court noted that the matter required more skill than a regular open account case. The trial court awarded attorney fees in the amount of $50,000. The trial court signed a judgment in favor of Monsanto and against KT Farms, Aymond, Herron, KT-One, and TKI, in solido, for $671,041.60, plus 18% interest per year on the unpaid balance from December 31, 2013, until *196 paid, together with court costs and $50,000 in attorney fees. The defendants appealed.
RIGHT TO RECOVER ON DEBT, INTEREST, AND ATTORNEY FEES
The defendants argue that the trial court erred in granting judgment in favor of Monsanto based upon the provisions of the 2011 and 2013 "Interest Free Seed Financing" agreements. They maintain that the 2011 agreement filed into evidence was illegible, making it impossible to determine its terms and provisions. They assert that the first three pages of the 2013 agreement were blank. Therefore, according to the defendants, there are no applicable provisions in either agreement which would render them liable to Monsanto.
The defendants also argue that the trial court erred in awarding Monsanto $50,000 in attorney fees. They contend that the 2011 and 2013 agreements did not provide for the award of attorney fees. In the alternative, the defendants argue that, if attorney fees are due, Monsanto is limited to an award of reasonable attorney fees. Based upon the affidavit of Monsanto's attorney regarding the amount of work done in this matter, Monsanto should only recover $15,000, not $50,000 as awarded by the trial court.
As will be discussed below, we find that the trial court properly awarded Monsanto the money due for items purchased by KT Farms, but erred in basing that decision entirely on the 2011 agreement. Also, the trial court erred in awarding interest and attorney fees based solely upon the 2011 contract and erred in the amounts awarded. The trial court further erred in finding that Aymond and Herron personally guaranteed the debts of KT Farms, in addition to the guaranty executed by TKI, and erred in finding all the defendants liable to Monsanto in solido.
2011 Agreement
While the trial court properly awarded Monsanto $671,041.60 for charges made by KT Farms, it erred in basing that decision solely upon the terms of the 2011 financing agreement. The copy of the 2011 contract filed into evidence does not contain any legible provisions setting an 18% per year interest rate or entitling Monsanto to recover attorney fees. The legible portion of the 2011 agreement provided:
FarmFlex 2010-2011
Interest Free Financing Agreement
[Illegible] below ("Customer") agrees to pay Monsanto Company ("Monsanto") for the purchase of Monsanto seed products that Customer has [Illegible] Dealer listed below and that the Dealer has assigned to Monsanto pursuant to the terms of Monsanto's current FarmFlex Financing [Illegible] of Customer's purchases that the Dealer may assign to Monsanto is limited to the Customer's credit limit approved in relation to this [Illegible] may change or withdraw that credit limit at anytime [sic], except to the extent seed that has already been delivered to Customer within the [Illegible] credit limit. Customer will provide Monsanto financial information whenever Monsanto requests it.
[Illegible] pay Monsanto according to the terms of Monsanto's FarmFlex Program for the applicable year. If Customer has not received a copy of [Illegible] FarmFlex Program or needs an additional copy, Customer may obtain a copy of the current year terms from the Dealer or by calling [Illegible]5-2676 option 5.
[Illegible] Customer will pay the "Total Due" on the Delivery Receipt, on the Invoice the Dealer assigns to Monsanto, or on the amount of Customer's [Illegible *197 ] electronically by the Dealer to Monsanto, plus interest to the date of payment in full, which shall not be later than the Scheduled Due [Illegible] current Monsanto FarmFlex Program.
[Illegible] DISCOUNT: If Customer pays for an assigned order in part or in full on or before early cash discount program deadline for the current [Illegible] that has been paid by that date it (i) will be removed from the FarmFlex Program, (ii) the amount paid will be recalculated using [Illegible] cash discount, if any.
[Illegible] GOVERNING LAW: If Monsanto sends Customer a notice that it has denied credit, Dealer may require Customer to pay the order in cash [Illegible] Monsanto will send Customer a statement of the transaction following credit approval and delivery of product. By signing below, [Illegible] to assignments of Customer's account with the Dealer including any assignments to Rabo Agrifinance, Inc., and agrees to send [Illegible] to the address specified by Monsanto. This agreement shall be governed by the laws of the State of Missouri.
[Illegible] fails to pay for an assigned order plus the applicable interest, if any, in full on or before the Scheduled Due Date, Customer shall pay [Illegible] Due" shown on the assigned Delivery Receipt, Invoice, or the electronic assignment plus the applicable interest, (ii) a default charge [Illegible] after the Scheduled Due Date at the rate published in the FarmFlex program on that "Total Due" plus the accrued interest, and (iii) [Illegible] fees, collection agency fees, and court costs incurred by Monsanto in the event it is necessary to obtain assistance in collecting.[4]
The second paragraph of the agreement indicates that the terms of the agreement were contained in another document, a Farm Flex Program, which was not produced at trial.
The first page of the 2013 document is a blank credit application for that year. The next page of the document provides as follows:
INTEREST FREE FINANCING CUSTOMER LOAN AGREEMENT
This Customer Loan Agreement ("Agreement") is made by and between *198 the Customer named on the signature page hereto ("Customer") and Monsanto Company ("Monsanto").
The parties desire to enter into an agreement enabling Customer to pay for the purchase of Eligible Products from the Dealer named on page 2 of this Agreement ("Dealer") through loans under Monsanto's Seed 0% Interest Free Financing Program. Monsanto and Customer hereby agree as follows:
1. Defined Terms. Terms defined in this Agreement shall have their specified meanings. Capitalized terms used in this agreement but not defined herein shall have the meanings specified in the summary of the Seed 0% Interest Free (0%) Financing Program, as may be amended, modified, restated, or replaced from time to time (the "Program"). Customer agrees to be bound by the terms of the Program and will comply with such terms to the extent such terms are applicable to it. Customer hereby acknowledges receipt of a copy of the Program in effect on the date hereof. Monsanto may revise the terms of the Program at any time. Subject to any restrictions that may be imposed by law, these revised terms will apply to any new Advance after the effective date of the revision.
2. Disbursement and Repayment of Advances.
(a) Upon receipt of a properly completed Advance request from Dealer and subject to the terms and conditions of the Program, Monsanto may, in its sole and absolute discretion, make Advances for the account of Customer to pay Dealer for the purchase of Eligible Products. Customer acknowledges that Dealer has agreed that the proceeds of each Advance shall be used to pay Dealer for the purchase of Eligible Products; provided that Customer acknowledges that Dealer has authorized and directed Monsanto to apply the proceeds of any Advance directly to any obligations due and owing to Monsanto by Dealer. If Monsanto delivers a notice to Customer that it has denied a request for an Advance, Customer shall pay Dealer directly.
(b) The parties agree that only those Eligible Products that Customer has purchased directly from Dealer will qualify for financing under the Program. No other products or services offered by Dealer to Customer shall be eligible for financing under the Program.
(c) Pursuant to the Program, upon receipt of Monsanto's approval of an Advance request, Dealer shall promptly credit Customer's account with Dealer for the amount of such Advance and Dealer shall not collect or attempt to collect from Customer any invoice that has been paid by Monsanto pursuant to an Advance. Customer acknowledges and agrees that any failure of Dealer to perform its obligations under the Program, including without limitation, Dealer's failure to properly credit Customer's account with Dealer, shall not relieve Customer of its obligation to repay Advances as required by this Agreement. Customer further agrees that Monsanto shall have no liability to Customer arising from any acts or omissions of Dealer in connection with the Program.
(d) The effective date of an Advance shall be the date recorded in Monsanto's records. Customer promises to pay to the order of Monsanto the principal sum of each Advance on or before the Maturity Date with respect to such Advance; provided however, that upon the occurrence of an Event of Default, Customer agrees to pay interest at the rate of eighteen percent (18%) per year (or, if lower, the maximum rate allowed by *199 law) on the entire unpaid principal balance owed by Customer to Monsanto from the date of the Event of Default until paid. The amount of outstanding Advances shall be adjusted by Monsanto in the event of Customer's return of Eligible Products to Dealer prior to the Maturity Date in accordance with the terms and conditions of the Program.
3. Representations. To induce Monsanto to provide financing to Customer, Customer represents and warrants to Monsanto, as of the date of this Agreement and as of the date of each Advance that: (a) this Agreement does not conflict with any law, agreement or obligation by which Customer is bound; (b) this Agreement is the legal, valid and binding obligation of Customer, enforceable against Customer in accordance with its terms, and (c) the proceeds of each Advance shall be used solely for the purposes set forth above and shall not be used for any personal, family or household purpose.
4. Default. If any Event of Default shall occur and be continuing, then all amounts due or to become due to Monsanto under this Agreement shall, at the option of Monsanto and without notice or demand, accelerate and become immediately due and payable. Upon the occurrence of any Event of Default, Monsanto shall have the remedies provided by law or at equity. The failure or delay by Monsanto to exercise any right or to pursue a remedy, if any Event of Default should occur, shall not be considered a waiver of such default and shall not preclude Monsanto at any time from exercising any right or pursuing any remedy it may otherwise have. Upon the occurrence of any Event of Default, Customer agrees to pay, to the extent permitted by law, reasonable attorneys' fees if any unpaid balance is referred to any attorney for collection and said attorney is not the salaried employee of Monsanto and all costs of collection. Event of Default means (a) Customer's failure to pay any Advance when due or failure to perform any of the obligations of Customer under this Agreement; or (b) any representation made by Customer to Monsanto, or any financial statement or certificate furnished by Customer to Monsanto, shall be incorrect or incomplete in any material respect when made or furnished; or (c) dissolution or liquidation of Customer; or (d) Customer shall (i) suspend business or become insolvent, (ii) fail or be unable to pay its debts as they mature, (iii) commence or consent to the commencement of any bankruptcy, reorganization, arrangement, receivership or liquidation proceeding or any proceeding for the appointment of a custodian, receiver, liquidator, trustee, or other officer with similar powers over Customer or over any substantial part of Customer's property, or suffer the filing of a petition for any such proceeding which remains undismissed for more than thirty (30) days, or (iv) be adjudicated a bankrupt; or (e) any circumstance or event which results in the acceleration of any indebtedness of Customer to any party; or (f) any change in Customer's financial condition or means or ability to pay deemed by Monsanto to be adverse, or the occurrence of any other event as a result of which Monsanto deems itself insecure.
The final page of the 2013 document contained a fifth provision, setting forth miscellaneous matters and specifying that the dealer was Helena. KT Farms, as customer, through Aymond and Herron, signed this page to change the dealer. It is important to note that Monsanto did not argue that KT Farms entered into a new financing agreement in 2013, incorporating *200 the terms set forth above. The company contends only that the document changed the dealer.
When compared to the partially legible copy of the 2011 agreement, the 2013 document is clearly not the same and supplies terms and conditions that simply were not contained in the original agreement. No legible portion of the 2011 agreement provides for the payment of interest at the rate of 18% per year or attorney fees in the event of a default. Therefore, the trial court erred in basing Monsanto's right to recover solely upon the 2011 agreement, finding that Monsanto proved that KT Farms, through Aymond and Kyle, was liable to Monsanto for 18% interest per year on the debt until paid, and awarding attorney fees based on the agreement.
Open Account
However, under the facts of this case, Monsanto is not without recourse. Appeals lie from judgments, not reasons for judgment. Retail Merchants Ass'n, Inc. v. Forrester , 47,936 (La. App. 2 Cir. 5/15/13), 114 So.3d 1175, writ not cons. , 2013-1455 (La. 9/27/13), 123 So.3d 179. The appellate court shall render any judgment that is just, legal, and proper upon the record on appeal. La. C.C.P. art. 2164. Louisiana is a fact pleading state and no technical forms of pleading are required. La. C.C.P. art. 854 ; Gulfstream Servs., Inc. v. Hot Energy Servs., Inc. , 2004-1223 (La. App. 1 Cir. 3/24/05), 907 So.2d 96, writ denied , 2005-1064 (La. 6/17/05), 904 So.2d 706.
Monsanto carried its burden of proof regarding the debt owed by KT Farms under the open account law contained in La. R.S. 9:2781. That statute provides in pertinent part:
A. When any person fails to pay an open account within thirty days after the claimant sends written demand therefor correctly setting forth the amount owed, that person shall be liable to the claimant for reasonable attorney fees for the prosecution and collection of such claim when judgment on the claim is rendered in favor of the claimant. Citation and service of a petition shall be deemed written demand for the purpose of this Section. If the claimant and his attorney have expressly agreed that the debtor shall be liable for the claimant's attorney fees in a fixed or determinable amount, the claimant is entitled to that amount when judgment on the claim is rendered in favor of the claimant. Receipt of written demand by the person is not required.
B. If the demand is forwarded to the person by first class mail to his last known address, a copy of the demand shall be introduced as evidence of written demand on the debtor.
C. If the demand is made by citation and service of a petition, the person shall be entitled to pay the account without attorney fees by delivering payment to the claimant or the claimant's attorney within ten days after service of the petition in city courts and fifteen days after service of the petition in all other courts.
D. For the purposes of this Section and Code of Civil Procedure Articles 1702 and 4916, "open account" includes any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions. "Open account" shall include debts incurred for professional services, including but not limited to legal and medical services. For the purposes of this Section only, attorney fees shall be paid on open accounts owed to the state.
*201 E. As used in this Section the following terms shall have the following meanings:
(1) "Person" means natural and juridical persons.
(2) "Reasonable attorney fees" means attorney fees incurred before judgment and after judgment if the judgment creditor is required to enforce the judgment through a writ of fieri facias, writ of seizure and sale, judgment debtor examination, garnishment, or other post-judgment judicial process.
Any account which fits the definition of an open account fits within the ambit of the statute. Frey Plumbing Co., Inc. v. Foster , 2007-1091 (La. 2/26/08), 996 So.2d 969. An open account is analogous to a credit account. Ballard's Inc. v. North Am. Land Dev. Corp. , 28,437 (La. App. 2 Cir. 6/26/96), 677 So.2d 648. Inherent in the concept of an open account is that the amount is for services or goods rendered. Double-Eight Oil & Gas L.L.C. v. Caruthurs Producing Co., Inc. , 41,451 (La. App. 2 Cir. 11/20/06), 942 So.2d 1279.
The plaintiff in an action on an open account must prove his claim by a preponderance of the evidence. To prove his case, the plaintiff must show that a record of the account was kept in the course of business and introduce evidence supporting testimony of its accuracy. Once a prima facie case is made, the defendant must prove that the account is inaccurate or that he is entitled to certain credits. Retail Merchants Ass'n, Inc. v. Forrester , supra. See also Cole Oil & Tire Co., Inc. v. Davis , 567 So.2d 122 (La. App. 2 Cir. 1990) ; Bisso & Miller, LLC v. Marsala , 16-585 (La. App. 5 Cir. 3/15/17), 215 So.3d 469.
Attorney fees are not allowed except where authorized by statute or contract. The portion of La. R.S. 9:2781 allowing for attorney fees is penal in nature and is to be strictly construed. Akers v. Bernhard Mech. Contractors, Inc. , 48,871 (La. App. 2 Cir. 4/16/14), 137 So.3d 818, writs denied , 2014-1040 (La. 9/12/14), 148 So.3d 931, 2014-1100 (La. 9/12/14), 148 So.3d 934, 2014-1103 (La. 9/12/14), 148 So.3d 935 ; Capital Recovery Assistance, Inc. v. Nelson , 424 So.2d 357 (La. App. 2 Cir. 1982).
In this case, although Monsanto did not label its petition a suit on open account, it did seek to recover amounts due for products sold on credit to KT Farms. This fits the definition of an open account. In its pretrial statement, regarding the law applicable to this case, Monsanto included La. R.S. 9:2781 on open accounts and "all Louisiana articles, statutes, and case law regarding open accounts." In its reasons for judgment, the trial court, in awarding attorney fees, stated, "The case required more skill than that of a regular open account case[.]"
Monsanto properly made demand in accordance with the requirements of La. R.S. 9:2781 upon KT Farms through its partners, Aymond, Herron, and KT-One, and upon the guarantor, TKI. In addition to demand letters to Aymond and Herron, demand was made on all parties through citation and service of the petition, which set forth the correct amount of the debt.
At trial, Monsanto proved that KT Farms entered into a financing agreement in 2011, although, as discussed above, not all the terms of the agreement were legible or provided to the trial court. In 2013, KT Farms made purchases totaling $671,041.60, and made no payment on the debt. In proof of its claim, Monsanto filed into evidence credit memos from Monsanto and Helena based upon purchases made by KT Farms, along with invoices from Helena to KT Farms for the charges. Monsanto also filed into evidence the delivery tickets from Helena to KT Farms for the goods purchased, as well as its statement *202 of account to KT Farms covering the period from January 1, 2013, to February 18, 2014, showing that the amount due was $671,041.60. Monsanto also filed into evidence the guaranty agreement between TKI and Monsanto.
Monsanto satisfied its burden of proving by a preponderance of the evidence a prima facie case that the debt was owed by KT Farms. The burden then shifted to the defendants to prove the inaccuracy of the account or to prove that KT Farms was entitled to credits on the account. Both Aymond and Herron admitted that KT Farms entered into the 2011 agreement with Monsanto. Aymond and Herron said that KT Farms made purchases from Helena in 2013. Herron acknowledged that the signature on the guaranty between TKI and Monsanto was Aymond's.
At trial, Aymond questioned the proof of the debt, claiming the delivery tickets were not signed by representatives or employees of KT Farms. However, Willis testified that sometimes deliveries were signed for and sometimes they were not. Where the record shows that the plaintiff's business records and books were kept in the normal course of business and indicate that the merchandise was sold and delivered, the plaintiff need not prove actual delivery of each and every individual item. See Helena Chem. Co. v. Nichols , 96-856 (La. App. 3 Cir. 12/26/96), 695 So.2d 990, amended on reh'g , 96-856 (La. App. 3 Cir. 1/29/97), 695 So.2d 1000.
The defendants offered only the self-serving testimony of Aymond questioning the accuracy of the delivery tickets. The trial court obviously did not find that testimony to be credible, and we do not find that its determination was manifestly erroneous or clearly wrong. Where there is a conflict in the testimony, the trier of fact's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Rosell v. ESCO , 549 So.2d 840 (La. 1989) ; Murco, Inc. v. Streeter Serv. Elec., Inc. , 41,599 (La. App. 2 Cir. 11/1/06), 942 So.2d 690. Therefore, the defendants failed to satisfy their burden of proving that the account was inaccurate or that KT Farms was entitled to credits on the account.
Interest
While there was sufficient proof of the debt on open account, the trial court erred in finding that the plaintiff was entitled to interest at the rate of 18% per year. This provision was simply not contained in any legible portion of the 2011 agreement. The language from the 2013 agreement, supplied by Monsanto, clearly was not the same as the 2011 agreement. Monsanto never argued and the record contains no proof that the defendants executed the entire 2013 agreement, which contained the provision on interest that the trial court applied. However, the Louisiana Civil Code provides for the payment of legal interest on conventional obligations.
An obligor is liable for the damages caused by his failure to perform a conventional obligation. A failure to perform results from nonperformance, defective performance, or delay in performance. La. C.C. art. 1994. Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived. La. C.C. art. 1995. When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by R.S. 9:3500. See La. C.C. art. 2000. Because Monsanto did not prove that KT Farms agreed to interest at the rate of 18% per year in the event of default, it is limited to the recovery of *203 legal interest, from the date of judicial demand.
Attorney Fees
Further, because the 2011 agreement did not contain any legible provisions for the payment of attorney fees by a defaulting debtor, under the facts of this case, Monsanto is only entitled to attorney fees under the open account statute. As set forth above, La. R.S. 9:2781 provides for the recovery of reasonable attorney fees if the requirements of the statute are strictly complied with. Although the trial court based its recovery for attorney fees on the 2011 agreement, it found that the amount requested by Monsanto, 26% of the debt, was not reasonable. The trial court awarded a fee of $50,000, citing the time and skill involved and the experience of the attorney handling the matter. Monsanto maintains that the trial court did not abuse its discretion in setting the award and properly applied the factors in Saucier v. Hayes Dairy Products, Inc. , 373 So.2d 102, on reh'g (La. 1979), in making the award.[5]
We find that the $50,000 attorney fee award in this case was not reasonable and was an abuse of discretion. This matter, although unnecessarily complicated by Monsanto's failure to preserve legible copies of important documents, was a simple open account case that required only a short trial. A small number of exhibits were introduced. The record on appeal is one small volume. The attorney fee awarded by the trial court was not consistent with the statement by Monsanto's own counsel regarding the amount of time expended on this matter.
Monsanto's attorney filed an affidavit with the trial court stating that the collection agency handling this matter charged 26%, including attorney fees. Monsanto's attorney took the case on a 15% contingency fee basis, plus costs, and did not keep records of the hours spent on the matter. The attorney estimated he spent 40-50 hours on the case, exclusive of travel time. He charges $200 per hour for office time, and $300 per hour for out-of-office time. Monsanto included no figures for travel time. Travel time would have been minimal, due to the fact that only one short court appearance was made. We find that, under the facts presented here, a more than reasonable attorney fee in this matter is $15,000.[6] We amend the trial court judgment to award this amount.
Degree of Debtor Liability
We also find that the trial court erred in providing in its judgment that all the defendants were liable in solido in this matter. An obligation is solidary for the obligors when each obligor is liable for the whole performance. A performance rendered by one of the solidary obligors relieves *204 the others of liability toward the obligee. La. C.C. art. 1794.
In its reasons for judgment, the trial court stated that, in addition to TKI's guaranty of the debts of KT Farms to Monsanto, Aymond and Herron also guaranteed the debt. This finding is simply not supported by the record. Aymond, Herron, and KT-One were partners in KT Farms. A partnership is a juridical person, distinct from its partners, created by a contract between two or more persons to combine their efforts or resources in determined proportions and to collaborate at mutual risk for their common profit or commercial benefit. La. C.C. art. 2801. A partnership as principal obligor is primarily liable for its debts. A partner is bound for his virile share of the debts of the partnership but may plead discussion of the assets of the partnership. La. C.C. art. 2817. The use of the term "virile share" to describe per head liability among the partners of a general partnership is well-established within Louisiana partnership jurisprudence. See Hibernia Nat. Bank v. Carner , 997 F.2d 94 (5th Cir. 1993), as clarified on denial of reh'g (Sept. 15, 1993).
A contract of guaranty is equivalent to a contract of suretyship and the two terms may be used interchangeably. Fleet Fuel, Inc. v. Mynex, Inc. , 40,683 (La. App. 2 Cir. 3/8/06), 924 So.2d 480, writ denied , 2006-0762 (La. 6/23/06), 930 So.2d 977. Suretyship is an accessory contract by which a person binds himself to a creditor to fulfill the obligation of another upon the failure of the latter to do so. La. C.C. art. 3035. One who ostensibly binds himself as a principal obligor to satisfy the present or future obligations of another is nonetheless considered a surety if the principal cause of the contract with the creditor is to guarantee performance of such obligations. A creditor in whose favor a surety and principal obligor are bound together as principal obligors in solido may presume they are equally concerned in the matter until he clearly knows of their true relationship. La. C.C. art. 3037. A surety, or each surety when there is more than one, is liable to the creditor in accordance with the provisions of this Chapter, for the full performance of the obligation of the principal obligor, without benefit of division or discussion, even in the absence of an express agreement of solidarity. La. C.C. art. 3045. A surety may not recover from the principal obligor more than he paid to secure a discharge, but he may recover by subrogation such attorney's fees and interest as are owed with respect to the principal obligation. La. C.C. art. 3052.
Under these principles, it is clear that, as partners in KT Farms, Aymond, Herron, and KT-One are liable only for their share of the debt. As a guarantor, TKI is liable in solido with KT Farms. Therefore, we amend the trial court judgment to provide that Aymond, Herron, and KT-One are liable only for their virile share of the debt. Only TKI is liable in solido with KT Farms for the debt owed to Monsanto.
CONCLUSION
For the reasons stated above, although for different reasons than those assigned by the trial court, we affirm the trial court judgment finding that the defendants, KT Farms Partnership, through its partners, Kyle Aymond, Thad Herron, and KT-One LLC, and Thad Kyle Investments LLC, are liable to Monsanto for the principal amount of the debt, $671,041.60. We affirm that portion of the trial court judgment finding that Thad Kyle Investments, LLC is liable in solido with KT Farms.
We amend that portion of the trial court judgment finding that Aymond, Herron, and KT-One are liable in solido with KT Farms to provide that they are liable only for their virile share of the debt.
*205 We amend that portion of the trial court judgment finding that Monsanto is entitled to recover interest at the rate of 18% per year on the unpaid balance of the debt from December 31, 2013, until paid, to provide that Monsanto is entitled to recover legal interest on the debt from the date of judicial demand.
We amend that portion of the trial court judgment awarding Monsanto attorney fees in the amount of $50,000 to provide that Monsanto's attorney fee award is $15,000.
Costs in this court are assessed one-half to Monsanto and one-half to KT Farms Partnership, through its partners, Kyle Aymond, Thad Herron, and KT-One Farms LLC; and Thad Kyle Investments LLC. As amended, the trial court judgment is affirmed.
AFFIRMED IN PART; AMENDED IN PART; AFFIRMED AS AMENDED.

In its petition, Monsanto stated that the charter of KT-One was revoked in May 2013.

Willis stated that Helena also extended credit to KT Farms for the purchase of products not manufactured by Monsanto. Helena sued KT Farms in federal district court for amounts due on those goods and obtained a judgment.

Monsanto's petition requests attorney fees of 25%. The affidavit from Monsanto's attorney, filed after trial in connection with attorney fees, specified that a collection agency called D & S Limited, which handled the matter for Monsanto, "charged 26% (including attorney fees) for this matter."

On the same page, after Aymond's signature, was what appeared to be an agreement between Monsanto and Tensas, signed by a representative of Tensas. That portion of the document was also only partially legible and provided:
[Illegible] will assign the right to receive payment for Monsanto seed products pursuant [sic] the FarmFlex Interest Free Financing Agreement to [Illegible] are effective only to the extent credit is available to Customer that is associated with Dealer and are effective when the Dealer [Illegible] Receipt to Monsanto by marking the appropriate place on the Delivery Receipt and delivering it to Monsanto, Dealer assigns an Invoice to [Illegible] an assignment to Monsanto or FarmFlex on the Invoice and delivering it to Monsanto, by assigning the Customer's transaction to [Illegible] the appropriate place in the SeedTrak or MyMonsanto computer program or any similar computer program sponsored by Monsanto. [Illegible] payments may further be assigned by Monsanto to Rabo Agrifinance, Inc. Dealer agrees that (i) this Agreement incorporates Monsanto's [Illegible] Operations Manual; is genuine and legally enforceable; (ii) the seed products and sales price described in the assignment to Monsanto have [Illegible] as agreed with Customer; (iii) Dealer will retain for three years and forward to Monsanto if requested, any Dealer Receipts signed or [Illegible] for this transaction; (iv) Dealer has made no warranties to Customer, except such as appear on the Delivery Receipt; and (v) to Dealer's [Illegible] related FarmFlex Financing Application contains no untrue statements or omissions that might influence Monsanto's credit decision.

Saucier v. Hayes Dairy Products, Inc. , supra , provided that the factors to be considered as guides in determining the reasonableness of a fee include the following:
(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
(3) The fee customarily charged in the locality for similar legal services.
(4) The amount involved and the results obtained.
(5) The time limitations imposed by the client or by the circumstances.
(6) The nature and length of the professional relationship with the client.
(7) The experience, reputation and ability of the lawyer or lawyers performing the services.
(8) Whether the fee is fixed or contingent.

In their brief to the trial court, the defendants have posited that $15,000 would be a more reasonable amount.